136 A.2d 510 (1957)
Petition of Lewis PIERCE, Adm'r, d.b.n.c.t.a. Estate Joseph How.
Supreme Judicial Court of Maine.
October 17, 1957.
*511 Nathan W. Thompson, Portland, for Portland Marine Society.
Devine, Devine & John E. Bates, Portland, for Geo. How, Lena How and Edna Pettingill.
Daniel C. McDonald, Portland, for Seaman's Friend Society.
LeBlanc & Bullerwell, Westbrook, for Sailors Bethel Society.
Verrill, Dana, Walker, Philbrick & Whitehouse, Portland, for Maine Medical Center.
Barnett I. Shur, Portland, for City of Portland.
John W. Sturgis, Portland, for Lillian Sturgis, trustee.
*512 Ralph W. Farris, Jr., Asst. Atty. Gen., for the State.
Before WILLIAMSON, C. J., and WEBBER, BELIVEAU, TAPLEY, SULLIVAN and DUBORD, JJ.
DUBORD, Justice.
This case is before us upon petition of Lillian S. Sturgis, trustee under the will of Joseph How, asking for a new construction of the will and for instructions concerning the administering of the trust fund under the cy pres doctrine.
The administration of an estate is usually a prosaic procedure. However, the history of this case, throughout the eighty-seven years which have elapsed since the death of Joseph How, is most interesting and presents a set of facts, which one might expect to find in a romantic novel, rather than in the true story of an estate, the assets of which, at the outset and for more than forty years, were considered too small to be worth-while, and which have now grown to a value too large to permit of the administration of the trust in accordance with the seeming directions of the testator.
The testator, Joseph How, was a man of the sea. He was master of the bark known as the Ellen Stevens. Records indicate that he was commissioned master in 1862 and his name appears as captain of this bark in 1869. For the benefit of the uninitiated, a bark is described in Webster's unabridged dictionary as a three-masted vessel having her foremast and mainmast, square-rigged, and her mizzenmast fore-and-aft rigged. Joseph How was born on July 22, 1820 and died on October 26, 1870. His home was in Portland and he is buried there.
On October 25, 1870, just the day before his death, he executed his last will and testament.
Under the first paragraph of this will he bequeathed the possession and use of all his personal property, including money, bonds, vessels, choses in action and furniture to his wife, Alice W. How. By the second paragraph he bequeathed to his wife the income from all of any real estate of which he may have been seized. Under the provisions of the third paragraph he directed that his real estate as well as his interest in the bark, "Eben Stevens," be sold and that the proceeds of said sale be invested and the income from said investment paid to his wife, for and during her natural life.
At this point it may be well to point out, that the record copy of the will as we have it, describes his ship as the "Eben Stevens." This may be a typographical error. The correct name of the ship was the "Ellen Stevens" as indicated by records of the American Ship Masters' Association. However, this discrepancy is of no moment at this particular time.
Under the provisions of the fourth paragraph of his will, he directed that at the decease of his wife, his executor should pay the entire income to his mother, Eliza How, if she should then be living, for and during her life, and in case his mother should not be living, then the income was to be paid to his brother, James L. How, for and during his natural life.
The record in the case does not give us the information, but it is assumed that these directions on the part of the testator were carried out.
The controversy now before us, arises under the fifth paragraph of the will which reads as follows:
"I request and direct that after the decease of my said wife, mother and brother, my said estate, real and personal shall be appropriated to the founding of a home for indigent seamen, and I authorize and empower my executor to invest the said property *513 and the income thereof and to use and employ the same in such manner as will do the most good to the class of indigent seamen."
The will was filed in the Probate Court within and for the County of Cumberland and on the third Tuesday of November, 1870 duly allowed. The executor named in the will, James P. Baxter, was appointed. He later resigned, and on June 15, 1875, Lewis Pierce was appointed administrator de bonis non with the will annexed.
The inventory shows that the entire value of the estate was only about $1,500. There is nothing in the record to indicate how long the widow lived, nor when the mother or the brother named in the will, as contingent beneficiaries, died. All we know is that the matter remained in abeyance until at the April Term, 1912 of the Supreme Judicial Court for Cumberland County, a bill in equity was filed by Lewis Pierce, the administrator, asking the Court to construe the fifth paragraph of the will and to determine the ownership of the assets in the estate. This bill was reported to the Law Court for determination upon bill and answer.
It was contended by the heirs at law, that the attempted trust under consideration had failed, both for indefiniteness and because the amount available was so small as to render it impossible to carry out the provisions of the trust even if one were created.
In an opinion dated November 15, 1912, written by then Associate Justice Cornish, later to become Chief Justice, this Court held that the bequest constituted a good public charitable trust. The opinion provided that a trustee appointed to administer this trust was to invest the residuum of the estate and employ the income for the benefit of indigent seamen. It was stated that the trustee could do this directly, or he could turn over the income to some worthy society or association organized for that purpose. The manner in which the money was to be expended was left to the sitting Justice who was to determine to whom the income should be paid and through what channel this kindly gift could be made most effective. This case is reported in 109 Me. 509, 84 A. 1070.
Although the mandate of the Law Court directed that a decree should be entered in accordance with its opinion, no such decree was written and again the matter remained in abeyance for a long period of years. Eventually this case was dismissed from the docket. For twenty-five years the estate was apparently forgotten, probably because the available amount was too small to really be worth-while.
Now we come to a very interesting part of the story. It appears that a short time before his death, Captain How had invested the reported amount of $3,000 in a new corporation, which was then being organized by a friend of his in Chicago. Subsequent developments indicate that the captain probably did not place must value upon this investment, and if the certificate representing his stock ownership in this corporation ever came into the possession of the executor, administrator or trustee, they too probably felt there was little value attached to this item, as such poor care was given to the certificate that it became lost, misplaced or destroyed. However, the corporation which was engaged in the leather business prospered to an extent never dreamed of by its founder, and through a series of stock dividends and accretions in value, the estate of Captain How now amounts to more than $300,000, with more than $100,000 of income ready to be expended for the purposes provided for in his will.
When the Court was apprised as to the situation, the case was restored to the docket and a decree, pursuant to the opinion of the Law Court in the Pierce case, to be found in 109 Me. 509, 84 A. 1070, was entered nunc pro tunc on December 12, 1938, and this decree holds that the bequest contained *514 in the fifth paragraph of the last will and testament of Joseph How is in its terms a good public charitable trust; that the purpose of this public charitable trust is definite in its objects, is lawful and is to be regulated by the trustee of the estate of Joseph How, who has been or may be appointed and qualified in the Probate Court within and for the County of Cumberland. The trustee was ordered to invest the residuum of the trust fund and employ the income thereof for the benefit of indigent seamen, doing this directly or turning over the income to some worthy society or association organized for that purpose, but before so doing, the trustee was ordered to apply to a Justice of the Supreme Judicial Court for determination to whom and in what amounts the income should be paid. On April 8, 1937, a trustee was appointed. He subsequently resigned, and on March 8, 1944, Lillian S. Sturgis, the petitioner herein was appointed as successor trustee.
On December 29, 1954, Lillian S. Sturgis filed a petition in the Supreme Judicial Court in Equity in Cumberland County in the name of Lewis Pierce, Administrator, asking the Court to determine to whom and in what amounts the income of the trust estate should be paid.
On July 16, 1956, the sitting Justice of the Supreme Judicial Court in Equity instructed the trustee to pay to the Portland Seamen's Friend Society the amount of $10,000, to be used exclusively by it for assistance for the indigent, needy and destitute seamen, and for no other purpose, this money to be expended under the supervision of the Attorney General under the provisions of Section 4, Chapter 20, R.S. 1954, which provides that the Attorney General shall enforce due application of funds given or appropriated to public charities within the state and to prevent breaches of trust in the administration thereof.
On August 13, 1956, the trustee filed another petition in the Supreme Judicial Court in Equity for a new construction of the will and for instructions concerning the administering of the fund under the cy pres doctrine. It seems to have been assumed by all parties that the beneficiaries of the trust were supposed to be seamen of the class to which Captain How belonged. Based upon this assumption, in her petition, she alleged that after paying the amount of $10,000 to the Portland Seamen's Friend Society, in accordance with decree of Court, she still has income of over $100,000 in her possession, which she is unable to expend for the benefit of indigent seamen, for the reason that there are not a sufficient number of this class to allow for the expenditure of the money available, and she further asked for instructions as to whether or not she may be permitted to expend the funds under the cy pres doctrine for the benefit of seamen of other classes such as fishermen, lobstermen, and others.
Various organizations claiming to have been organized for the purpose of rendering assistance to indigent seamen, or who throughout the years have been rendering such assistance, filed appearances and were heard by the sitting Justice at the time of the hearing. The heirs-at-law of Captain How who comprise grandnephews, grandnieces, great-grandnephews, and great-grandnieces also appeared.
The State of Maine because of the provisions of Section 4, Chapter 20, R.S.1954, previously referred to, was represented by the Attorney General. The trustee, and those who appeared, with the exception of the heirs-at-law, take the position that the fund now available should be administered under the cy pres doctrine, and the class of beneficiaries extended to include seamen of types other than that to which Captain How belonged.
The heirs-at-law argue, first that the trust has failed; second, that there was no general charitable intent on the part of Captain How; and third, that the matter has been judicially settled and is res judicata by reason of the decree of the Supreme Judicial Court in Equity dated July 16, 1956, at which time the trustee was instructed to pay *515 the sum of $10,000 to the Portland Seamen's Friend Society. The heirs-at-law, therefore, contend that a resulting trust has arisen in the entire fund for their benefit.
Before passing to a discussion of the cy pres doctrine, and its applicability to the instant case, we can readily dispose of the third argument advanced in behalf of the heirs-at-law, to the effect that the matter has been judicially settled by the decree of the Supreme Judicial Court previously referred to. One of the essential elements of the doctrine of res judicata is identity of issue. It is clear that the issue for our determination at this time is not at all the issue which was concluded in the hearing which culminated in the decree of July 16, 1956. Consequently, it is our opinion that there is no strength to this argument in behalf of the heirs-at-law.
The words "cy pres" are Norman French for "as near." The phrase when expressed to its full implication was "cy pres comme possible" which means "as near as possible."
The doctrine of cy pres is the principle that equity will, when a charity is orginally or later becomes impossible or impractical of fulfillment, substitute another charitable object which is believed to approach the original purpose as closely as possible. It is the theory that equity has the power to mould the charitable trust to meet emergencies.
"Admittedly cy pres is an unusual doctrine. Generally, if a court cannot enforce or discover the intent of a donor or grantor,it gives no relief. It does not ordinarily substitute for the dubious intention of the party or parties some scheme which the court thinks ought to have been their intent. If the original intent is clear, but cannot be carried out, the court does not usually substitute a second best intent and give a judgment or decree carrying it into effect." Bogert, Trusts & Trustees, Vol. 2A § 431, Chap. 22, Page 316.
"If property is given in trust to be applied to a particular charitable purpose, and it is or becomes impossible or impracticable or illegal to carry out the particular purpose, and if the settlor manifested a more general intention to devote the property to charitable purposes, the trust will not fail but the court will direct the application of the property to some charitable purpose which falls within the general charitable intention of the settlor." Restatement of the Law, Trusts, § 399, Page 1208.
"Where property is given in trust for a particular charitable purpose, the trust will not ordinarily fail even though it is impossible to carry out the particular purpose. In such a case the court will ordinarily direct that the property be applied to a similar charitable purpose. The theory is that the testator would have desired that the property be so applied if he had realized that it would be impossible to carry out the particular purpose. The theory is that although the testator intended that the property should be applied to the particular charitable purpose named by him, yet he had a more general intention to devote the property to charitable purposes. The settlor would presumably have desired that the property should be applied to purposes as nearly as may be like the purposes stated by him rather than that the trust should fail altogether. The principle under which the courts thus attempt to save a charitable trust from failure by carrying out the more general purpose of the testator and carrying out approximately though not exactly his more specific intent is called the doctrine of cy pres." Scott on Trusts, Vol. 3, § 399.
"Cy pres means `as near to,' and the doctrine is one of construction, the reason *516 or basis thereof being to permit the main purpose of the donor of a charitable trust to be carried out as nearly as may be where it cannot be done to the letter." 14 C.J.S. Charities § 52 a., p. 512.
"The cy pres doctrine is properly applied in a case where there is a general charitable purpose, but a literal compliance with the terms of the trust becomes impossible or impracticable in which case the court directs the administration of the trust as nearly as possible in conformity with the intention of the donor or testator." 14 C.J.S. Charities § 52 c., p. 514.
Our own Court has in many instances expounded the doctrine.
"In the administration of trusts, under the general equity jurisdiction of the court, it is an old and familiar principle that if the original purpose of a public charity fail, and there are no objects to which, under the specific terms of the trust, the funds can be applied, the court may determine whether, in the event that has happened, it was not the probable intention of the donor that his gift should be applied to some kindred charity, as nearly like the original purpose as possible. This is commonly known as the `doctrine of cy pres,' which, in its last analysis, is found to be a simple rule of judicial construction, designed to aid the court to ascertain, and carry out as nearly as may be, the true intention of the donor. Jackson v. Phillips, 14 Allen, Mass., 539; 2 Perry, Trusts §§ 717-729, and cases cited. But if it appears that the gift was for a particular purpose only, and that there was no general charitable intention, the court cannot by construction, apply the gift cy pres the original purpose. `There is a class of cases,' says Mr. Perry, `where the gift is distinctly limited to particular persons or establishments, and upon a change of circumstances the doctrine of cy pres does not apply.'" Doyle v. Whalen, 87 Me. 414, at page 426, 32 A. 1022, at page 1026, 31 L.R.A. 118.
The doctrine of cy pres does not apply to private trusts.
"`Private trusts,' says Mr. Pomeroy, are * * * `for the benefit of certain and designated individuals, in which the cestui que trust is a known person or class of persons. Public, or, as they are frequently termed, "charitable" trusts, are those created for the benefit of an unascertained, uncertain and sometimes fluctuating body of individuals, in which the cestuis que trustent, may be a portion or class of a public community, as for example, the poor or the children of a particular town or parish.' 2 Pom.Eq.Jur. § 987. `In private trusts,' says Mr. Perry, `the beneficial interest is vested absolutely in some individual or individuals, who are, or within a certain time may be, definitely ascertained; and to whom, therefore, collectively, unless under some disability, it is, or within the allowed limit, will be competent to control, modify, or end the trust. Private trusts of this kind cannot be extended beyond the legal limitations of a perpetuity. * * * But a trust created for charitable or public purposes, is not subject to similar limitations, but it may continue for a permanent or indefinite time.'" Doyle v. Whalen, supra, 87 Me. at page 425, 32 A. at page 1025.
A very fine exposition of the prerequisites to the application of the doctrine of cy pres can be found in Chapter 5, of the book entitled The Cy Pres Doctrine in the United States by Edith L. Fisch.
The author points out that before the cy pres doctrine will be applied three prerequisites must be met. First, the court must find that the gift creates a valid charitable *517 trust. Second, it must be established that it is to some degree impossible, or impractical to carry out the specific purpose of the trust, for the cy pres doctrine is inapplicable when the particular purpose of the settlor can be effectively carried out. The third prerequisite is the requirement of a general charitable intention, and it is this prerequisite which has given rise to most of the litigation in cy pres cases. This requirement of general charitable intent grew up as a result of the theory that the cy pres doctrine is a device to carry out the intent of the settlor of the trust.
The first prerequisite, viz.:That the gift creates a valid charitable trust, has been taken care of by the decision of this Court in Petition of Pierce, 109 Me. 509, 84 A. 1070, in which the Court held that the bequest in the How will is in terms a good public charitable bequest.
Passing now to the second prerequisite, that it must be established that it is to some degree impossible or impractical to carry out the specific purpose of the trust, we find a situation where all the interested parties are agreed, and this statement applies to the heirs-at-law as well, that while the number of indigent seamen of the class seemingly intended by the testator has become substantially reduced, it has not entirely disappeared. Moreover, the record clearly indicates that there are still indigent seamen in existence, even of the class to which the testator belonged. Consequently, the trust has not entirely failed. However, it is also clear that the trust fund now available is in an amount too large to permit its application for the relief of indigent seamen of the class to which the testator belonged. It has, therefore, become impossible to carry out the specific purpose of the trust, if the specific purpose was to render assistance only to indigent seamen of the class to which the testator belonged.
The important issue, therefore, for determination is whether or not the testator expressed in his will a general charitable intent. If so, then the application of the cy pres doctrine would be in order and the scope of the beneficiaries seemingly covered in the trust can be broadened and enlarged. In other words, seamen of a type different from that to which the testator belonged can be included as beneficiaries.
We give our attention, therefore, to the issue of determining whether or not Captain How manifested a general charitable intention when he created the trust which is now before us for construction.
Legal authors all describe this general charitable intention as a desire to give to charity generally, rather than to any one party, object or institution.
"Whether or not the testator evinced a general charitable intent or, as otherwise said, evinced an intent to devote the subject matter of the gift to charitable purposes generally, is a question of interpreting the will of the testator. Being a question of interpretation of a will the intent must be discovered within the four corners of the instrument being construed, read in the light of the surrounding applicable circumstances." First Universalist Soc., Bath v. Swett, 148 Me. 142, 149, 90 A.2d 812, 816; or as said in Lynch v. South Congregational Parish of Augusta, 109 Me. 32, 82 A. 432, 435, "In the light of existing conditions."
"The question of whether or not a testator is making a charitable bequest has evinced a general charitable intent or is making a specific bequest to a specific beneficiary for a specific charitable purpose is a question of interpretation of the particular will under consideration. To attempt to formulate a general rule which would solve all such cases would be an attempt to achieve the impossible. Nor do the cases from our own or other jurisdictions materially aid in deciding the particular question of interpretation with which we are here concerned, as *518 distinguished from a decision of the fundamental principles of law from which the authority of the Court to apply the cy pres doctrine arises." First Universalist Soc., Bath v. Swett, 148 Me. 142, 150, 90 A.2d 812, 817.
"The courts are more ready to apply the doctrine of cy pres where the particular trust fails at a time after its creation than where the particular purpose fails at the outset. Thus, where the particular object of the charitable bequest is in existence at the testator's death, but ceases to exist at a subsequent time, the legacy does not lapse, and the fund, having once vested in charity, may be applied cy pres by the court." 14 C.J.S. Charities § 52, p. 516.
"No general rule can be enunciated as to the manner in which the cy pres doctrine will be applied, but each case must necessarily depend on its own peculiar circumstances. One limitation of the rule is that the purpose of the gift cannot be changed. For example, if property is devised to education, it cannot be judicially diverted to religion, or the relief of the poor or the sick, or to general charity, or vice versa. However, this limitation does not prevent the substitution by the court of another object of the same general charitable nature where the original object fails." 14 C.J.S. Charities § 52, p. 517.
"Whether the cy pres rule attaches depends upon whether or not the will itself discloses a general charitable intention or a gift for a particular charitable purpose without that intention. The rule under each state of facts has been clearly stated as follows: `If it appears from the will that the intention of the testatrix was that her property should be applied to a charitable purpose whose general nature is described so that a general charitable intent can be inferred, then if by a change of circumstances or in the law it becomes impractical to administer the trust in the precise manner provided by the testatrix, the doctrine of cy pres will be applied in order that the general charitable intent which the court regards as the dominant one may not be altogether defeated. * * * But if the charitable purpose is limited to a particular object or to a particular institution, and there is no general charitable intent, then, if it becomes impossible to carry out the object, or the institution ceases to exist before the gift has taken effect, and possibly in some cases after it has taken effect, the doctrine of cy pres does not apply, and in the absence of any limitation over, or other provision, the legacy lapses.'" Gilman v. Burnett, 116 Me. 382, 386, 102 A. 108, 109, L.R.A.1918A, 794.
Authors on the subject of trusts are all in accord that if property is given in trust to be applied to a particular charitable purpose, and at the time when the property is given it is possible and practical and legal to carry out the particular purpose, but subsequently owing to a change of circumstances it becomes impossible or impractical or illegal to carry out the particular purpose, it is easier to find a more general charitable intention of the settlor than it is where the particular purpose fails at the outset.
"The court can fairly infer an expectation on the part of the settlor that in course of time circumstances might so change that the particular purpose could no longer be carried out, and that in such a case the settlor would perfer a modification of his scheme rather than that the charitable trusts should fail and the property be distributed among his heirs who might be very numerous and only remotely related to him." Restatement of the Law, Trusts, § 399.f.
"There is stronger reason, therefore, to apply the cy pres doctrine where the particular purpose of the testator fails at a subsequent time than there is *519 where the purpose fails at the outset." Scott on Trusts, Vol. 3, § 399.3, Page 2110.
"In the absence of a provision providing that a charitable trust shall terminate if the specific purpose can no longer be accomplished, it is rarely held that the trust fails altogether because of the impossibility of carrying out the specific directions of the testator, where the trust was a permanent trust and the impossibility was due to circumstances happening after the trust had been created." Scott on Trusts, Vol. 3, § 399.3, Page 2110.
"When the gift cannot be carried out in the precise mode prescribed by the donor, effect has been given to his general purpose by adopting a method which seemed to be as near his intention as existing conditions would permit. Such a construction is not the result of an arbitrary power exercised in disregard of the donor's wishes for the public benefit, but is as truly based upon a judicial finding of his intention as applied to new conditions, as is the construction of a will, deed, or other written contract. The mere making of a gift for charitable purposes, which is unlimited as to the length of time it may continue, presupposes a knowledge on the part of the donor that material change in the surrounding circumstances will occur which may render a literal compliance with the terms of the gift impractical, if not impossible, and it is not unreasonable to infer that under such circumstances the nearest practicable approximation to his expressed wish in the management and development of the trust will promote his intention to make his charitable purpose reasonably effective, for it would be rash to infer that he intended that the trust fund should be used only in such a way that it would not result in a public benefit; in other words that he wished his general benevolent purpose to be defeated, if his method of administering the trust should become impracticable." City of Keene v. Eastman, 75 N.H. 191, 72 A. 213, 214.
"In construing charitable trusts, the absence of a provision for forfeiture will be considered as evidence that the donor did not intend the estate to revert while the carrying out of his general purpose is practicable." City of Keene v. Eastman, supra.
"The absence of a gift over or a provision for reversion in case of failure of the particular charitable purpose is some evidence of a general charitable intent." Fisch on The Cy Pres Doctrine in the United States, § 5.03(a) Page 152, and cases cited.
"A general charitable intention has also been implied where the bulk of the donor's fortune is given to charity." Fisch on The Cy Pres Doctrine in the United States, § 5.03(a), Page 152, and cases cited.
"Where the charitable gift has once taken effect and the particular object subsequently fails, the courts have less difficulty in finding a general charitable intent than when the particular object has ceased to exist before the gift takes effect. In such a case, the courts infer an expectation on the part of the settlor that with the passage of time changing conditions might make the effectuation of the particular purpose impossible or impractical, and in that event the donor would prefer a modification of the trust rather than a reversion of the property to his heirs or next of kin." Fisch on The Cy Pres Doctrine in the United States, § 5.03 (a) Pages 153, 154, and cases cited.
"If property is given upon trust to be applied to a particular charitable purpose, and the purpose is fully accomplished without exhausting the trust property, and if the settlor manifested a more general intention to devote the *520 whole of the trust property to charitable purposes, there will not be a resulting trust of the surplus, but the court will direct the application of the surplus to some charitable purpose which falls within the general charitable intention of the settlor." Restatement of the Law, Trusts, § 400, Page 1220.
A review of the cases decided by this Court in which the principle of the cy pres doctrine was involved may be of interest. The doctrine was discussed in Allen v. Trustees of Nasson Institute, 107 Me. 120, 77 A. 638. In this case, the Court pointed out that the doctrine applies only when two prerequisites exist, viz., when the court may see in the instrument a general charitable purpose as well as a specific gift, which has failed. In deciding that the cy pres doctrine did not apply, the court found that neither of these prerequisites existed. The trust had not failed and there was no evidence of a general charitable intent.
In Brooks v. Belfast, 90 Me. 318, 38 A. 222, the Court found that there was a gift for a specific purpose with no general charitable intent and so the doctrine was not applied. Again in Doyle v. Whalen, 87 Me. 414, 32 A. 1022, 31 L.R.A. 118; it was held that the trust created in this instance was for the benefit of definite persons who could be identified, and so the doctrine was not applied.
The doctrine was applied in Manufacturers National Bank v. Woodward, 141 Me. 28, 38 A.2d 657; in Stevens v. Smith, 134 Me. 175, 183 A. 344; in Snow & Clifford v. President and Trustees of Bowdoin College, 133 Me. 195, 175 A. 268; and in Lynch v. South Congregational Parish of Augusta, 109 Me. 32, 82 A. 432.
The doctrine was not applied in Dupont v. Pelletier, 120 Me. 114, 113 A. 11; Bancroft v. Maine State Sanatorium Association, 119 Me. 56, 109 A. 585; Gilman v. Burnett, 116 Me. 382, 102 A. 108, L.R.A.1918A, 794; in Merrill v. Hayden, 86 Me. 133, 29 A. 949.
In the case of Merrill v. Hayden, supra, a testator had left all of his property to one of his two daughters, to hold during her lifetime, and at her death the residue was to go to the Maine Free Baptist Home Missionary Society. During the lifetime of the testator this society was dissolved by act of the Legislature and all its property transferred to another Association created for a different purpose. It was held that the legacy lapsed and the cy pres doctrine not applicable.
In Gilman v. Burnett, supra, and Bancroft v. Maine State Sanatorium Association, supra, the cy pres doctrine was not applied because the Court found no evidence of general charitable intent.
In the case of Lynch v. South Congregational Parish of Augusta, supra, the Court found that after reading the will in the light of existing conditions, the testator had evinced a general charitable intention and the doctrine of cy pres was applied.
In the cases of Snow & Clifford v. President and Trustees of Bowdoin College, supra, and Stevens v. Smith, supra, the Court reached the conclusion that the testators had evinced a general charitable intention and upon inability to comply with the original purpose of the trust, the doctrine of cy pres became applicable.
Two cases from other jurisdictions where the doctrine was applied are of interest. In the case of Society for Promoting Theological Education v. Attorney General, 135 Mass. 285, a trust was set up providing that indigent students in theology who should be deemed worthy of assistance would be paid sums not exceeding one hundred or one hundred fifty dollars a year for three years. The trust income increased substantially and there was not a sufficient number of indigent students to exhaust the income. The court ruled that under the cy pres doctrine the payments could be increased.
In the case of Hoyt v. Bliss, a Connecticut case, 93 Conn. 344, 105 A. 699, a trust was set up providing for the support of one student. *521 A surplus of money developed and the court ruled that the trustee could use the money to support additional students.
While, as previously stated, it seems to have been assumed by all interested parties that the beneficiaries of the trust created by Captain How were indigent seamen of the class to which he belonged, we are not thoroughly convinced that this is so. At times much earlier than the year when Captain How's will was executed, our Court had described crewmen of other types of vessels as seamen.
It seems apparent that even in 1870, the term "seamen" was not limited to mariners of the type who manned vessels such as the Ellen Stevens.
That this is so, is shown by a decision of this Court in Lewis v. Chadbourne, 54 Me. 484; a case decided prior to 1868, in which fishermen in the mackerel industry were described as seamen. Another is Holden v. French, 68 Me. 241, decided in 1878, in which this Court described the crewmen of a fishing vessel as seamen.
If we endeavor to project ourselves into the past and contemplate upon the intention of Captain How, we may well suppose that while he was perhaps primarily interested in crewmen of ships such as he was master of, he nevertheless had in mind that wider group of men whose major means of livelihood was gained from the sea. He used the expression, in his will "the class of indigent seamen." Webster describes the word "class" as "a group of individuals ranked together as possessing common characteristics or as having the same status;" and also "a group of persons, having common characteristics or attributes."
Webster defines the word "indigent" as follows:
"Destitute of property or means of comfortable subsistence; needy; poor; in want; necessitous"; and Joseph Addison the English poet and essayist said: "Charity consists in relieving the indigent."
After making provision for those most dear and close to him, his wife, mother and brother, Captain How gave all of his estate for a public charity. The will neither provides for forfeiture or limitation over. We are convinced that when he executed his will on the day before he died, he was imbued with a deep charitable intent, and that he intended all of his worldly goods and effects to be devoted forever to the relief of indigent seamen, not only of the class to which he belonged, but to all classes of indigent seamen.
It is, therefore, our opinion that the scope of the beneficiaries of this kindly gift should be widened and enlarged. We reach this conclusion not necessarily through the application of the cy pres doctrine, but rather through an interpretation of the intention of the testator at the time he executed his will. See Guilford Trust Company v. La Fleur (Inhabitants of Guilford), 148 Me. 162, 91 A.2d 17.
The trustee is, therefore, authorized to use and employ the income for the benefit of indigent seamen not only of the class to which Captain How belonged, but to other classes, by way of illustration and not of limitation, such as crewmen of merchant vessels, oil tankers and fishing vessels.
In the determination of who shall be classed as indigent seamen, the trustee may give consideration to the modern laws and latter day adjudications as to the interpretation of what a "seaman" is.
A good definition is to be found in 79 C.J.S. Seamen § 1, (a.) p. 490.
"While the word `seaman' is a flexible word, the meaning of which ordinarily depends on the circumstances in which it is used, in the broad sense of the word a seaman is a mariner of any degree, *522 including one who does any sort of work aboard a ship in navigation."
In her petition, the trustee requested instructions as to whether or not lobster fishermen may be included among the beneficiaries. We are of the opinion that lobster fishermen are not seamen within the meaning of the foregoing definition, nor within the intention of the testator.
The trustee is given the right to employ agents for the purpose of investigating cases, and to pay such agents reasonable compensation for their services and charge the same to the trust fund. The trustee in using and employing the income for the benefit of indigent seamen of the classes above described, may do this directly or she may turn over the income to some worthy association or associations organized for that purpose; the exact details to be left to a Justice of the Supreme Judicial Court who is to determine to whom the income shall be paid and through what channel the gift can be made most effective.
Associations to whom any portion of the income is paid may charge a reasonable commission for expenses of administration, the amount of such commission to be determined by the trustee, subject to the approval of a Justice of the Supreme Judicial Court. Any association to whom any of the income is paid shall file at least annually an account of its disbursements with the trustee. The Portland Seamen's Friend Society to whom the sum of $10,000 has already been paid shall forthwith file an account of its disbursements with the trustee. Copies of all accounts of the trustee which are filed in the Probate Court, as well as copies filed by associations to whom any portion of the income has been paid are to be filed with the Attorney General of the State of Maine.
Case remanded to the sitting Justice for a decree in accordance with this opinion. Costs and reasonable counsel fees to be fixed by the sitting Justice, paid by the Trustee and charged in her Probate account.