### ROBERT W. TRAIP ACADEMY
### v.
### Rose Cook STAPLES et al.

Supreme Judicial Court of Maine.

April 8, 1974.

Bernstein, Shur, Sawyer & Nelson, by William W. Willard, Peter J. Rubin, Portland, for plaintiff.

Charles R. Larouche, Asst. Atty. Gen., Augusta, Verrill, Dana, Philbrick, Putnam, & Williamson, by Roger A. Putnam, Portland, Guardian Ad Litem.

Before DUFRESNE, C. J., and WEATHERBEE, POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

POMEROY, Justice.

Robert W. Traip Academy, a corporate trustee of various trusts, has brought this complaint pursuant to 14 M.R.S.A. 6051(10), alleging there is doubt and seeking direction as to the "mode of executing a (the) trust(s) and the expediency of making changes and investments of property held in trust."

Evidence has been received by a Justice of this Court sitting in the Superior Court. In the judgment of such Justice, "this action involves questions of law of sufficient

importance and doubt as to justify reporting this action to the Law Court."

All parties have agreed to such report and have so stipulated.

Several trusts, all charitable in nature, are involved in the proceedings; only three require extended discussion as the trustee proposes to continue administering the remaining trusts in the same manner they have been administered since they were created.

The testamentary trust of Robert W. Traip, consisting of real and personal property, is one concerning which the trustee proposes changes in administration which will, if allowed, make application of the trust res quite different from that required by the literal language of the trust. (See Appendix A for the trust provisions of the Robert W. Traip Will.)

Also requiring extensive discussion is the testamentary trust of Jethro H. Swett. (See Appendix B for the specific provision of the Jethro H. Swett Will.)

The testamentary trust of Harry W. Cook, being entwined as it is with the Jethro Swett trust, must be considered with the Swett and Traip trusts. (See Appendix C for the specific provision of the Harry W. Cook Will.)

The testamentary trusts of Mark W. Paul, the intervivos trust of Ralph G. Carruthers, the testamentary trust of Moses Victor Safford, the intervivos trust of Pauline H. Morrison, the testamentary trust of William F. Pinkham, and the Music Fund, present no particular problems as the trustee proposes to continue the administration and application of the proceeds of all these trusts in the same manner they have been conducted and applied since their inception.

The record before us shows Robert W. Traip died in 1864. His Will, by which the testamentary trust with which we are here concerned was created, was allowed in conformity with the then law governing the allowance of Wills. The Will itself directed that the trustee named therein apply to the Judge of Probate for additional trustees who were to receive all the residue and remainder of his estate,

"for the purposes of an Academy in said Kittery . . . under such rules, regulations and limitations as the Trustee under this will shall then in writing . . . prescribe . . . . To avoid embarrassment in the accumulation of this trust, I forbear to do more than to express explicitly my general purpose of establishing in the town of Kittery, an Academy in which the higher branches of education shall be taught."

The trustees were appointed and the rules and regulations were approved by the Judge of Probate in November, 1902.

On March 8, 1905, the Robert W. Traip trust was reorganized as Robert W. Traip Academy, a nonprofit, charitable and educational corporation under the laws of the State of Maine. The purpose of the corporation was stated to be to carry out the provisions of the late Robert W. Traip trust or any other bequest or devise that may be made to the trustees, for the purpose of implementing the Traip trust.

On February 19, 1957, by order of the appropriate Probate Court, the Robert W. Traip trust estate was dissolved and all trust funds which had been conveyed to it were ordered transferred to the Robert W. Traip Academy. The corporation exists today as the legal entity by which the trusts are operated and is the plaintiff herein.

The plaintiff-trustee proposes by this complaint that we authorize and direct it to convey the real property held in its possession under the trust provisions of the Wills of Robert W. Traip, Harry Cook and Jethro Swett, to the Inhabitants of the Town of Kittery, to be held by the Inhabitants in trust and administered as set forth in the various trust instruments; or as an alternative that it be directed to lease the

property to the Town of Kittery for a 99-year term.

The trustee would also have us direct it to continue administration of the personal estate constituting a part of the total trust res in its custody for the purposes described in the trust instruments.

There seems to be no dispute but that in the present circumstances continued operation of Traip Academy, as it has been operated for the past several years, is unfeasible if not impossible.

The question then becomes: What application can be made of the corpus of the trust estates remaining in the hands of the trustee?

That the suggestion of the trustee to this Court has the appeal of simplicity is apparent.

The real question becomes: Is the trustee's proposal legally permissible under the terms of the trusts?

It is axiomatic that the property of a charitable trust in the hands of a trustee must be applied in accordance with the wishes of the trustor. Dunn v. Morse, 109 Me. 254, 83 A. 795 (1912).

"The intention of the testator (donor) is the guide, or, in the phrase of Lord Coke, 'the lodestone,' of the court." Jackson v. Phillips, 96 Mass. (14 Allen) 539, 591 (1866).

It is equally well settled that charitable trusts are the objects of this Court's peculiar regard. Snow, et al. v. Bowdoin College, 133 Me. 195, 199, 175 A. 268, 270 (1934). As this Court said in that case:

"As these (charitable trusts) are not subject to the ordinary rules against perpetuities and may continue indefinitely, special problems arise with respect to their administration. However wise a testator may be, it is impossible for him to foresee all the vicissitudes, which may affect the object of his bounty through the passage of time and the happenings of chance."

Three questions suggest themselves in the matter now before us:

(a) What were the donors' intentions in establishing the charitable trusts now being examined by us?

(b) Can the intention of the donors continue to be carried out?

(c) If such intention cannot continue to be carried out, what disposition must be made of the trust res now in the possession of the trustee?

In Gorham v. Chadwick, 135 Me. 479, 200 A. 500 (1938), this Court said:

"Although a will speaks only from the maker's death, the language used in the testament must be construed as of the date of its execution and in the light of the then surrounding circumstances." 200 A. at 502.

Another and accurate statement of this rule is that a Will is not operative until the death of the maker and then speaks his or her intention at the time of its execution.

We recently reaffirmed this rule in Louisa T. York Orphan Asylum v. Erwin, Me., 281 A.2d 453 (1971).

The language employed by the testator, i.e., "to avoid embarrassment in the accumulation of this trust, I forebear to do more than express explicitly my general purpose of establishing in the town of Kittery an Academy in which the higher branches of education shall be taught," has as its key words "an Academy in which the higher branches of education shall be taught."

These words must be interpreted by giving them the meaning they would have been understood to have at the time the

testator created the trust,[1] and not as of the time this action was commenced.

Very little appears in the record concerning the background of Mr. Traip.

We are told only that he was born in Kittery, became a substantial citizen in the town and acquired considerable wealth when measured by the standards of that day.

We also know that he had very little formal education as none was available to inhabitants in the area at the time he was a young man.

We do learn much from a *"Term paper"* written by Kenneth Pruett, as a requirement toward the completion of a course in the history of education at the University of Maine (1939), which Term paper is included in the record in this case.

We are told Kittery was first settled in 1623. In 1630 Kittery, which was then called Agamenticus and Piscataqua, included the territory which is now the towns of Berwick, North Berwick, most of South Berwick and Eliot.

The early settlers came to the area to engage in fishing, the trapping of furbearing animals, and lumbering. They at first settled about the river mouth and on the Isles of Shoals.

The area at that time was very wild and it was very difficult to even exist on the land. As the Pruett *"Term paper"* says:

"They had to fight for existence and had but little time for education which at best would be the learning of sufficient Latin to understand the 'catechism.' "

Since the early settlers in the Kittery area had little religious fervor, there was practically no organized religious activity

and thus no educational facilities offered by the Church.

It was not until 1650 when the Rev. John Brock, a graduate of Harvard College, came to live on the Isles of Shoals that there was any attempt by the religious to introduce education.

Everts and Peck in their History of York County acknowledge that in 1661 "settlers offshore (Isles of Shoals) were distinguished for their intelligence and morality."

Religious men, Pruett says, probably taught school as best they could in the homes of different people on the Isles of Shoals.[2]

However, when the fishing industry slackened in the early Eighteenth Century, the Isles of Shoals became practically deserted.

The organized government on the mainland appears to have been much less faithful in providing education for their children. Stackpole, the historian of York County, reports that in 1675 "the selectmen of Kittery were presented at Court for not taking care that their children and youth be taught the catechism."

While the educational opportunities in the area improved slightly from the period commencing in 1675 to the period with which we are most concerned, during the lifetime of Robert Traip, at the time of his death in 1864, there was no general system of public education in the area.

District schools existed in various places in Kittery but these provided only the most elementary educational facilities.

There were no public high schools supported by taxation offering educational op-

---

1. The exact date of the execution of the Will was January 23, 1864.

2. Alexander Dennett, writing of the Isles of Shoals as it was in 1640, is quoted as saying, "It was evidently no common little fishing village in those remote days. It apparently possessed not only wealth but refinement. We are even told that on Smutty Nose there was a Seminary of such repute that even gentlemen of some of the towns sent their sons there for literary instruction."

portunities to most of the children of the area.

The only institutions offering any educational opportunities beyond the elementary grades were the privately operated schools which were commonly called "academies."

Although these were often assisted by land grants, they were never publicly operated or supported by government.

We are told that Robert Traip was not one of the more fortunate children whose parents were able to afford the private education available only in an academy.

It is, we think, discernible from the language employed in his Will that Mr. Traip deplored the absence of opportunity for the young people of Kittery to obtain education beyond the elementary school level. He determined to devote the assets of his estate to supplying that need. He doubtless knew that he could have left his money to the town in trust to be used toward the operation of a public high school. Whatever experience had convinced him that his purposes could better be accomplished through the vehicle of a privately administered academy we do not know but he chose to rely upon his trustees, rather than public officials, for the carrying out of his admirable intentions.

■ We are satisfied then that to allow the trustee to turn over the corpus of the trust he created to government for operation by the government of educational facilities would be contrary to what we conceive to be the clear intention of the testator.

We are satisfied that carrying out the intention of the testator does not require the continued support and maintenance of a building.

The objects of Mr. Traip's bounty, it seems to us, were the children of the Kittery area. His laudable desire was to make it possible, insofar as he could do so, for the children of the area to obtain an education qualitatively beyond that made available to them by the local government.

At the time the trust was set up, that intention could best be carried to fruition by constructing a building and operating an academy therein.

It is agreed by all parties in these proceedings that it is no longer economically feasible to continue doing that which was feasible 70 years ago. In the intervening years the quality of education offered by local government has improved to such an extent that the quality of education Robert Traip saw obtainable only through the establishment of an Academy is today available through the government-operated, tax-supported school system.

The Lodestar by which the trustee must be guided is what we see as Robert Traip's intention, i. e., that the corpus of the Traip trust be devoted to assisting youth in the Kittery area to continue to obtain an education qualitatively superior to that provided by local government, supported by tax-raised funds.

The trustee's proposal that the real estate of the trust be conveyed to the town for a nominal consideration and that the town operate the school is not acceptable.

To allow this to be done, we hold, would be contrary to the terms of the trust and thus not legally permissible.

We are satisfied that although the operation of Traip Academy by the trustee as heretofore has been done is no longer economically feasible, the intention of Robert Traip can continue to be carried out by the trustee.

This is not to say that the trustees must use the trust res for purposes entirely separate from the facilities and procedures for high school education furnished by the town government. It would not be foreign to the purposes of the donor for the trustees to use all or part of the trust res to supplement the budgetary capabilities of the town government. However, the trust-

ees must not abdicate to public officers their important responsibilities. The choice of activities to which the trust res is to be devoted, and the advisability of its continued use for these purposes, must be that of the trustees, in their discretion.

Many devices, such as visual teaching aids, etc., for example, which may not be within the budgetary capability of the town government, could be purchased for use in the schools and would be an appropriate and legally permissible use of the trust res now in the hands of the trustee. (We are confident other uses will suggest themselves to the trustee.)

■ The record reveals the funds of the testamentary trust of Jethro Swett were, in fact, employed in the erection of a building which is an integral part of the Academy buildings built by use of the Traip trust.

One clause of the Swett trust we deem of controlling significance in the issue now before us. Mr. Swett directed that,

"Should my estate prove too small to erect any suitable building as hereinafter provided for, then I direct that whatever remainder there may be, be used by the *Academy Trustees* as a general fund for the benefit of said Academy."

We think it clear from this that Mr. Swett visualized the trust funds he created being used to further the purposes of the Robert Traip trust.

Although many years ago it was feasible to build an additional building and operate it as a part of the Academy, since it is no longer economically feasible to operate the Academy as part of the Traip trust, it is obviously no longer feasible to continue operating the Swett Memorial Hall.

Mr. Swett made it plain that he wished the name, Jethro H. Swett, to be memorialized. With this clear direction of the testator in mind we direct that the trustee, after the buildings are sold as we shall hereafter direct, attach the name "Jethro H. Swett Memorial Fund" to at least a

portion of the moneys derived from the sale of the buildings heretofore erected by means of the moneys received from the testamentary trust of Jethro Swett, which buildings heretofore have been named Jethro H. Swett Memorial Hall.

■ The testamentary trust of Harry Cook by its terms is also entwined with the destiny of the Robert Traip trust. Mr. Cook also directed that the name Harry H. Cook be memorialized.

We direct the trustee to memorialize Harry H. Cook by applying the inscription "Harry H. Cook Memorial Fund" to a portion of the proceeds of the sale of the real estate as hereinafter directed.

In the exercise of our equitable jurisdiction which is *"derived from its* (our) *general power over the administration of trusts"* (Snow, et al. v. Bowdoin College, supra), we direct that the trustee proceed to the sale of the land and buildings purchased and erected by use of the funds derived from the Robert Traip trust, the Jethro Swett trust and the Harry Cook trust, as soon as it is feasible to do so, at fair market value. When this has been done the trustee shall make specific and detailed proposals in writing to the Superior Court as to the specific purposes, for which it proposes to use the funds so derived.

These proposals shall be reported to the Superior Court which shall consider such proposals and give further direction to the trustee thereon.

This cause is remanded to the Superior Court for action consistent with this opinion.

All Justices concurring.

## APPENDIX A

The trust provision of the Robert W. Traip will is as follows:

"After the death of my brother and both of my sisters, I direct the trustee

under this will, before named, to apply to the Judge of Probate for said County of York, for the appointment of Trustees to be joined with the Trustee under this will, who shall upon being duly appointed commissioned, and qualified in conjunction with the trustee under this will, receive in trust all the rest, residue and remainder of my estate, and appropriate the same to the procuring suitable buildings for the purpose of an Academy in said Kittery, and the net income thereafter shall be forever applied to the maintenance of an Academy in said Kittery, under such rules, regulations and limitations as the Trustee under this will shall then in writing, with the written approbation of said Judge of Probate, prescribe, which said rules and regulations certified by said Trustee and said Judge of Probate, shall be entered at large upon the records of the doings of said Trustee so to be appointed, and shall then, afterwards, forever, constitute the fundamental rules, regulations and limitations for the appropriation of this bequest and the fulfillment of this trust. To avoid embarrassment in the accumulation of this trust, I forbear to do more than to express explicitly my general purpose of establishing in the town of Kittery, an Academy in which the higher branches of education shall be taught. But I direct that the fundamental rules, regulations, and as far as may be judged proper, the details and limitations for the administration of this trust shall be established and recorded at the outset in the manner herein before provided.

"After the decease of the trustee herein named, I authorize and request said Judge of Probate upon conferring with the Executors of said Trustees, and with the cestique trust to appoint and commission a suitable person, or his successor to complete said trust."

## APPENDIX B

The testamentary trust of Jethro H. Swett is as follows:

"At the decease of my said wife, or as soon after as practicable, I instruct my Trustees to turn over to the Trustees under the Will of Robert W. Traip, late of Kittery, in charge of the Academy Fund, all the residue and remainder of my estate, consisting of all accumulations and property before referred to in this item of my will, for the purpose of erecting a brick building upon the Traip Academy lot in Kittery, Maine, suitable for a Gymnasium and a suit of rooms for a Young Men's Christian Association combined, the same to be two stories in height, the first story for the Gymnasium, the second story for rooms of the Y.M.C. Association, if deemed most advisable by the Academy authorities. Should the sum of my estate not be sufficient to erect a building suitable for these purposes, in connection with any sum which may be at the disposal of the Academy Trustees, for that purpose, at the time said Trustees may invest the same in safe and productive securities until the income thereof in connection with any other funds at the disposal of said Trustee shall amount to a sum sufficient for that purpose.

"If at the end of twenty-one years from the date of the turning over of my estate to the Academy Trustees a sufficient sum cannot be obtained for the purpose named, then I direct that a brick building of one story in height for a Gymnasium be erected as before named, the same to be called the Jethro H. Swett Memorial Building.

"In case a two story building be erected I desire that the lower story, or Gymnasium, be called the Jethro H. Swett Memorial Hall.

"Should my estate prove too small to erect any suitable building as hereinbefore provided for, then I direct that whatever remainder there may be, be used by the Academy Trustees as a general fund for the benefit of said Academy. Before turning over my estate as

before directed, I instruct my Trustees to dispose of all my real estate and convert it into personal property unless the Academy Trustees prefer to take any part thereof in which case my Trustees may so transfer it and give the requisite deed thereof. All my just debts must be paid before said transfer."

## APPENDIX C

The testamentary trust of Harry W. Cook is as follows:

"I give and bequeath to the TRUSTEES of the ROBERT W. TRAIP ACADEMY, of said Kittery, the sum of FIFTEEN THOUSAND DOLLARS ($15,000.00), to be held and invested by them, and the principal and accumulations thereon to be applied towards the cost of the construction of either an addition to the present Swett Memorial, or towards the cost of construction of such additional permanent school building or buildings, either of which, the TRUSTEES, in their discretion at any future time may deem expedient, necessary and proper.

"It is my desire that such building be inscribed and called the 'HARRY H. COOK MEMORIAL.'

"In the event that any contribution of equal or greater sum than FIFTEEN THOUSAND DOLLARS ($15,000.00) is given to the TRUSTEES of said TRAIP ACADEMY, at any future time, for an addition to the Swett Memorial, or for the cost of construction of any additional permanent school building, the name of such other benefactor or benefactors may, in the discretion of the TRUSTEES, be added with the name of HARRY H. COOK to designate said addition or building.

"It is my express direction that this bequest, together with the accumulations thereon, be used only for the purpose of defraying part of the cost of a future addition to the Swett Memorial, or a fu-

ture permanent school building, and not for the purpose of maintenance or repair of any existing school facilities."