STATE of Maine

v.

Clarence W. RAND et al.

Supreme Judicial Court of Maine.

Nov. 8, 1976.

Lester A. Olson, Asst. Atty. Gen., Dept. of Transportation, Augusta, Ronald M. Roy, Chief Counsel, Land Damage Board, Winslow, for plaintiff.

Jensen Baird Gardner Donovan & Henry by George S. Isaacson, Kenneth M. Cole, III, Portland, for Clarence and Miriam Rand.

William J. O'Brien, Jr., Charles A. Lane, Portland, for City of Portland.

Before DUFRESNE, C. J., and WEATHERBEE,* POMEROY, WERNICK, ARCHIBALD and DELAHANTY, JJ.

WERNICK, Justice.

The State of Maine, acting through its Department of Transportation (Department), took by eminent domain—for use in the construction of Interstate 295—a triangular parcel of land at Winslow Street and Forest Avenue in the City of Portland which the City had held, and maintained, as "Winslow Park." Following a "blanket" award by the Land Damage Board of $30,000 as just compensation for the taking, the Department brought a civil action of interpleader (Rule 22 M.R.C.P.) in the Superior Court (Cumberland County) for an adjudication of the proper distribution of the award.[1] Named as defendants were the City of Portland, grantee under a 1903 deed conveying the property to the City for use as a park, and Clarence W. Rand and Miriam D. Rand stipulated to be the sole surviving heirs of Miriam Winslow, the grantor of the 1903 deed.

The Justice presiding in the Superior Court decided: (1) the 1903 conveyance created a charitable trust, (2) the Department's exercise of eminent domain had caused failure of the trust, and (3) there could be no *cy pres* administration of the trust because the donor had no general charitable intent.

Judgment was entered, pursuant to the order of the presiding Justice, adjudicating

that defendants Rand were entitled to the $30,000 fund. The City has appealed from the judgment.[2]

We sustain the appeal.

The following facts are stipulated.

In early January, 1903, Miriam Winslow, then of Woodstock, Vermont, conveyed to the City of Portland by quit claim deed the triangular parcel of land which became "Winslow Park." Miriam Winslow's parents were James N. and Ella M. Winslow who had resided in the neighborhood in which the "Winslow Park" land was situated. Miriam Winslow herself had lived in the vicinity of the "Winslow Park" land during her parents' lifetime.

The deed recited that Miriam Winslow conveyed the parcel

"in further consideration of my love and affection for my . . . parents, and to perpetuate their memory, . . .."

It also contained the following proviso:

"Provided, however, that this conveyance is made upon the condition that the premises herein described shall be forever held and maintained by said City of Portland as a public park to be named Winslow Park, the same to be improved and cared for under the direction and supervision of the Park Commissioners of said City of Portland, the work of improvement of said premises to be begun on or before June 1st. A.D. 1903, and completed within two years from said date, otherwise, said premises shall revert to the grantor. And it is my wish that there shall be placed and forever maintained at some suitable point within

---

* WEATHERBEE, J. sat at argument but died before the opinion was adopted.

1. The Land Damage Board, apparently aware of the ownership dispute underlying the instant litigation, named the three defendants here as "owner(s) of record" and did not delineate their respective interests (pursuant to 23 M.R.S.A. § 159). The Board left it to the Department to initiate interpleader proceedings to resolve the ownership dispute.

2. An appeal by the Department was dismissed by the presiding Justice on grounds that it was not a "party aggrieved by . . . [the] judgment." See: 14 M.R.S.A. § 1851.

said park a tablet of stone or bronze bearing an inscription in substance as follows:

"Winslow Park. Presented to the City of Portland January 1, 1903, by Miriam Winslow in Memory of her parents James N. Winslow and Ella M. Newhall Winslow."

By resolve of its Council dated January 5, 1903, the City of Portland accepted the conveyance and complied with its directions until the date of condemnation. Should the City receive the $30,000 fund, it will construct a new "Winslow Park" at the intersection of Baxter Boulevard and Preble Street Extension (within a mile of the original location) and there install the original commemorative plaque in honor of Miriam Winslow's parents.

The City contends that the Winslow deed effected a conditional gift under which the City became the holder of a fee simple determinable with a possibility of reverter in Miss Winslow (and her heirs).[3] On this theory the City claims that it should be paid the entire condemnation award because the interest held by the Rands is too remote and speculative to be compensable. See, e. g., *United States v. 53¼ Acres of Land*, 139 F.2d 244 (2nd Cir. 1943); Restatement of the Law, Property § 53(b). In the alternative, the City views the Winslow deed as creating a charitable trust and maintains that the presiding Justice erred in holding that there could be no *cy pres* administration of the trust.

The Rands counter with alternative contentions. Should the transfer be deemed a conditional gift, they maintain that circum-

stances peculiar to this case give them a compensable interest in the condemnation proceeds. Even more strenuously, however, the Rands assert the Winslow deed created a charitable trust of a nature precluding *cy pres* administration.

*I—The Scope of the City's Authority to Receive the Winslow Conveyance*

Two sets of statutes[4] in effect in 1903 precipitate a preliminary question whether there can be merit in the alternative "charitable trust" contention presented both by the City of Portland and the Rands. These statutes indicate, at least facially, that *only* if Miriam Winslow's proffered gift of *land* was a " *conditional gift* " would there have been lawful authority in the City to take and maintain it.

The earlier of these statutory sets, codified in 1903 as R.S.1883, Chapter 3 §§ 51–54, (hereinafter the "money . . . in trust" statute) was enacted in substantially the same form as P.L.1873, Chapter 92 §§ 1–4. It provided:

"Sec. 51. Any city or town may receive *money* by donation or legacy *in trust* for benevolent, religious, or educational purposes, for the erection and maintenance of monuments, and for the benefit of public cemeteries and lots therein; *provided*, that the city or town lawfully consents.

"Sec. 52. Interest shall be allowed if the fund is used by the city or town; otherwise it shall be placed at interest or income, the city or town being responsible for its security.

"Sec. 53. The city or town, by its officers or agents, shall apply the fund or

---

3. We note the inapplicability, here, of the provisions of 33 M.R.S.A. § 103 rendering a contingent ownership interest in land a fee simple absolute when the specified contingency does not occur within 30 years of creation. The last sentence of the statute states: "This section shall not apply where both such fee simple determinable and such

succeeding interest, or both such fee simple and such right of entry are for public, charitable or religious purposes; nor shall it apply to a deed, gift or grant to the State or any political subdivision thereof."

4. These statutes were ancestral to 30 M.R.S.A. §§ 1903 and 1904.

its income in accordance with the written directions of the donor or testator, made known at the time when the fund was accepted.

"Sec. 54. If the city or town fails to apply the fund or its income at the times and for the purposes prescribed in said directions, it reverts to the donor, if living; otherwise, to his heirs." (emphasis supplied)

Also in effect in 1903 was P.L.1887, Chapter 11 §§ 1–2, as amended by P.L.1899, Chapter 44 §§ 1–2 (hereinafter the "conditional gift" statute).[5] This statute stated:

"Section 1. Whenever the municipal officers of any city or town are notified in writing by the executors of any will, or by the trustees created by virtue of the terms thereof, that a devise or bequest has been made upon conditions by the testator of said will or by any individual, that he intends to make a conditional gift, in behalf of said city or town the municipal officers of said city or town, shall, within sixty days after said notice to them, call a legal meeting of the inhabitants of said city or town qualified to vote upon city or town affairs. Said municipal officers shall give public notice in their warrants, of the objects of said meeting, and such other notice as said municipal officers shall deem proper. At such meeting, the said inhabitants shall vote upon the acceptance of said devise or bequest or conditional gift, and if a majority of the legal voters present, then and there vote to accept said devise or bequest or conditional gift, in accordance with the terms contained in said will, and upon the conditions made by the testator or by said individual, said municipal officers of said city or town, shall forthwith notify said executors or trustees, or individual, in writing, of said acceptance by said city or town aforesaid, or the non-acceptance thereof.

"Section 2. Whenever the executors or trustees or said individual, under any will have fully discharged their duties respecting the payment, delivery or otherwise or any devise or bequest, or conditional gift, to said city or town; and said city or town have accepted said devise and bequest or conditional gift in accordance with the conditions of said will or the terms of said conditional gift as set forth in section one of this chapter, then said city or town shall perpetually comply, and strictly maintain and keep all the conditions and terms contained in said will or said conditional gift by virtue of which said devise or bequest or conditional gift was so made, and any city or town so accepting said devise or bequest, or conditional gift and receiving the same, or enjoying the benefits therefrom, is hereby authorized to raise money to carry into effect the requirements and terms of said will or said conditional gift by virtue of which said devise or bequest or conditional gift was so accepted and received. The provisions of this chapter shall apply only to devises and bequests and gifts, devised and bequeathed or given to cities and towns for educational, benevolent and charitable purposes and objects, or for the care, protection, repair and improvement of cemeteries owned by said cities or towns." (emphasis supplied)

It is plain from the words underscored that the former of the above statutes mentions *only* "money" as the proper subject-matter of a gift in "trust" (emphasis supplied) whereas the latter authorizes *any kind* of property as the proper subject-matter of a "conditional gift." *If*, therefore, by these statutes the Legislature intended to delineate the *exclusive* methods by which municipalities were authorized to receive gifts of *land*, the City of Portland had lawful authority in 1903 to accept Miriam

---

5. The 1899 amendment extended the terms of the earlier statute to inter-vivos gifts.

Winslow's conveyance of land *only if it was a conditional gift* rather than the establishment of a trust.

*I-A. The Legal Framework Which Existed Independently of the "Money . . . in Trust" and "Conditional Gift" Statutes*

We must, first, examine the common law and statutory framework preceding the enactment of the "money . . . in trust" and "conditional gift" statutes to ascertain whether, against such background, these statutes may reasonably be taken as legislatively intended to be the *exclusive* sources of municipal authority, as of 1903, to receive gifts.[6]

 It is axiomatic that municipalities derive their powers from the Legislature alone, some by express statutory provision and others as incidents of their incorporation.

 There is no doubt that a municipal corporation is authorized to hold land, even when "disconnected from any public use", since, absent a particular disabling statute, such authority is conceived to inhere in the fact of existence as a body corporate. *Libby v. City of Portland,* 105 Me. 370, 372–374, 74 A. 805 (1909). See also: *Worcester v. Eaton,* 13 Mass. 371, 378 (1816).

When, however, it becomes necessary for a municipality to expend tax-derived revenues for the purchase, or—as required by the instant gift—the maintenance of property, additional constitutional and statutory questions are precipitated.

*I-A-1. The Constitutional Aspects*

 By virtue of Article IV, Part 3 § 1 of the Constitution of Maine monies raised by taxation may be expended only for public benefit. See: *Libby v. City of Portland,* supra, 105 Me. p. 373, 74 A. 805; *Allen v. Inhabitants of Jay,* 60 Me. 124, 128, 135 (1872).

 Although this Court has never directly addressed the question, we find plain and cogent indication that maintenance of a public park has long been looked upon as a public "use."

In 1871, one Justice of this Court who deemed unconstitutional, because for private use, proposed municipal "gifts" to assist local manufacturers, offered several examples of public "benefit" activity among which he included "the establishment of . . . parks." *Opinion of the Justices,* 58 Me. 590, 602 (1871) (opinion of Dickerson, J.). Ten years later, the Legislature delegated its power of eminent domain to municipalities comprising more than 1,000 inhabitants for the purpose of taking land for public parks. P.L. 1881, Chapter 76 § 1.[7] We have found no case reaching this Court since passage of that statute which doubts the legislative assumption that such condemnation would be for "public uses" under Article I, Section 21 of the Maine Constitution. Moreover, this view finds support in the law of other jurisdictions. *Shoemaker v. United States,* 147 U.S. 282, 13 S.Ct. 361, 37 L.Ed. 170 (1893); *Salisbury Land and Improvement Company v. Commonwealth,* 215 Mass. 371, 102 N.E. 619 (1913).

 The City's authority, as here under scrutiny, is additionally circumscribed, however, *statutorily* insofar as a municipality has only those powers which the Legislature has delegated to it by statutes (themselves constitutional). We turn, then,—without yet reaching the questions here *specially* precipitated by the particular

---

6. The issue is worthy of extended discussion since it was not until 1957, P.L.1957, Chapter 405 § 19 that the original 1873 provisions confined to trusts of "money" were extended to include trusts of "other property", as now provided in 30 M.R.S.A. § 1903.

7. This statute survives today, with no minimum population requirement, as 30 M.R.S.A. § 4001.

"money . . . in trust" and "conditional gift" statutes—to focus upon the *generalized* scope of authority legislatively delegated, as of 1903, to municipalities concerning the use of monies raised by taxation.

### I–A–2. The Generally Relevant Legislative Delegations of Authority

Tracing the history of the generalized legislative delegation to municipalities of the authority to use tax-derived monies leads us back to the beginning of statehood, and beyond. No general grant was given. Instead, tracking Massachusetts P. L. 1785, Chapter 75 § 7, the Maine Legislature gave to municipalities the power to raise taxes for

> "the settlement, maintenance and support of the ministry, schools, the poor, and *other necessary charges*." (P.L.1821, Chapter CXIV § 6) (emphasis supplied)

This Court early construed "other necessary charges" as limited to

> "expenses . . . clearly incident to the execution of the power granted, or which necessarily arise in the fulfilment of the duties imposed by law." *Bussey v. Gilmore*, 3 Me. 191, 196 (1824)

In *Bussey,* holding ultra vires the use of revenue to provide free passage over a toll bridge to town residents, this Court expressly adopted the Massachusetts construction of the predecessor statute in *Stetson v. Kempton*, 13 Mass. 271 (1816). *Stetson* indicates, by concrete example, the scope accorded the words "and other necessary charges" by both the Massachusetts and Maine Courts. Such "charges" embraced

> "the ordinary expenses of the year; such as the payment of such municipal officers as they should be obliged to employ, the support and defence of such ac-

tions as they might be parties to, and the expenses they would incur in performing such duties as the laws imposed, as the erection of powder-houses, providing ammunition, making and repairing highways and town roads, and other things of a like nature; which are necessary charges, because the effect of a legal discharge of their corporate duty. . . . But it cannot be supposed that the building of a theatre, a circus, or any other place of mere amusement, . . . could be justified under the term *necessary town charges*." (p. 279 of 13 Mass.) (emphasis in original)

In this vein, this Court struck down in *Hooper v. Emery*, 14 Me. 375 (1837) the distribution of revenues among town residents and in *Gale v. South Berwick*, 51 Me. 174 (1863) the payment of a reward for apprehension of a suspected murderer. See also: *Inhabitants of Westbrook v. Inhabitants of Deering*, 63 Me. 231 (1874).

However, as was observed in *Opinion of the Justices*, 52 Me. 595, 598 (1863):

> "[b]y subsequent Acts, further powers . . . [were] conferred upon towns, and the exercise of doubtful powers . . . confirmed by legislative authority." [8]

By 1841 the Legislature had added, in the revised version of P.L.1821, Chapter CXIV § 6, the power to raise funds for highways, bridges and cemeteries. R.S.1841, Chapter 5 § 22. After 1841 the Legislature continued to add, project by project, to the list of individualized undertakings for which monies were authorized to be raised by municipal taxation. It was in this manner that municipalities were delegated authority to use tax revenues for public parks.

Thus, towns comprising more than 1,000 inhabitants were, in 1881, given authority, with particular limitations not here materi-

---

**8.** In one instance the Legislature conferred such power immediately after judicial expression of doubt. See the "Note" following

*Hooper v. Emery*, 14 Me. 375, 382 (1837), citing P.L. 1838, Chapter 311.

al, to take land by eminent domain for public parks and compensate accordingly. P.L. 1881, Chapter 76 § 1. Implicit in such delegation of the power to take and compensate is the power to allocate municipal revenues to that end. Subsequently, the Legislature permitted municipalities of any size to choose park commissioners who

> "shall have the care and superintendence of the public parks *and direct the expenditures of all moneys appropriated for the improvement of the same.*" P.L. 1885, Chapter 291) (emphasis supplied)

These two statutes, read with all their necessary implications,[9] provide cogent evidence that the Legislature had conferred on municipalities authority to acquire and maintain land for public parks through the use of local tax revenues.

Hence, we conclude that as of 1903 the Legislature had already delegated to municipalities authority enabling the City of Portland to accept Miriam Winslow's deed and expend city funds to fulfill its conditions.

Remaining to be considered, however,—in this same area of the legislative delegation of power—is the question whether, as of 1903, the Legislature had imposed restrictions as to the *particular methodology* by which a donative transfer such as Miriam Winslow's must have been made to be capable of being validly maintained by the use of tax revenues.

Initially, we address this question independently of the "money . . . in trust" and "conditional gift" statutes.

█ Our perusal of early authorities convinces us that municipalities had been delegated authority to take title to real or personal property in either the manner of "trust" or "conditional gift" provided only that there was compliance with the constitutional and statutory strictures as to *purpose* already discussed.

In 1825, the Massachusetts Court turned back an attack on a will devising land "to the South Parish of Sutton, to be applied for the use of schools, and to be kept by the inhabitants forever." *Inhabitants of First Parish in Sutton v. Cole*, 3 Pick. 232 (1825). That Court observed that the real issue was not whether the parish could take "in trust" but whether it could receive donations for the contemplated *purpose*— schools—insofar as parishes, unlike towns, had no legal obligation to maintain schools. 3 Pick. 232, 237–238. Because, however, parishes had statutory *authority* (if not obligation) to establish schools, and to "raise taxes upon the inhabitants therefor",[10] the gift was held valid. See also: *Nourse v. Merriam*, 8 Cush. 11 (1851); *Webb v. Neal*, 5 Allen 575 (1863); *Vidal v. Girard's Executors*, 2 How. (43 U.S.) 127, 11 L.Ed. 205 (1844).

The opinions of this Court reflect the same views. In 1881, relying on the above-cited authorities, this Court held valid a residuary trust of mixed, real and personal property established for educational purposes. *Piper v. Moulton*, 72 Me. 155, 159 (1881). In *Piper*, Chief Justice Appleton reiterated without reservation the rule of *Sutton v. Cole*:

> "A trust for the support of schools or of a particular school as a high school, or for any purpose of general public utility is a valid trust. . . . *towns can hold property in trust for purposes with-*

---

9. A later amendment of P.L.1885, Chapter 291 expressly conferred upon cites and towns the power to "appropriate money for the purposes of this act . . . ." P.L.1907, Chapter 27, § 6.

10. At this time, the First Amendment to the Constitution of the United States was inapplicable to the States because there was no Fourteenth Amendment (and no doctrine of "incorporation"), and the State Constitutions of Massachusetts and Maine permitted religious schools to be supported with monies raised by taxation. See: Article VIII, Part First, Constitution of Maine; *Barnes v. First Parish Church in Falmouth*, 6 Mass. 401 (1810).

*in the general scope of their corporate
existence.*[11] (emphasis supplied)

Similarly, the Court in *Luques v. Inhabitants of Dresden*, 77 Me. 186, 191–192 (1885) struck down a gift of real property in trust to the Town of Dresden not on grounds of the form of the transaction or the type of property conveyed but because of its purpose and conditions—the expenditure of tax-derived monies to maintain a *private* cemetery. See also: *Manufacturers National Bank v. Woodward*, 138 Me. 70, 21 A.2d 705 (1941); *City of Bangor v. Merrill Trust Company*, 149 Me. 160, 99 A.2d 298 (1953).

We conclude, therefore, that pre-1903 limitations on the authority of municipalities to receive donations pertained to constitutional and statutory considerations as to the *use* for which the property was given rather than any distinctions relating to the type of property conveyed or the methodology of transfer.

Having thus decided that as of 1903 the City of Portland had already been given a generalized authority to receive Miriam Winslow's gift of land *either* in the manner of "trust" or "conditional gift", we turn to the question whether the "money . . . in trust" and "conditional gift" statutes were enacted with intention to supplant the previously conferred authority and be, henceforth, the *exclusive* sources of municipal authority as to the matters covered by their provisions.

We hold that the "money . . . in trust" and "conditional gift" statutes were without such purport.

■■ Statutes in derogation of existing law require strict construction. *Stanton v. Trustees of St. Joseph's College*, Me., 233 A.2d 718, 722 (1967). Neither of the statutes under scrutiny expressly deprived municipalities of rights already enjoyed, and we find lacking any manifestation of intent to do so by implication. More important, we discern the legislative purpose, read in light of our prior discussion, as having been to supplement rather than displace.

First, we look to the literal words of the statutes. The "money . . . in trust" sections, in effect in 1903 as R.S.1883, Chapter 3 §§ 51–54—and now codified, as amended, by 30 M.R.S.A. § 1903—govern donations for "benevolent, religious, or educational purposes", and, more specifically, for "monuments" and "public cemeteries." Similarly, the sections concerning devises, bequests and conditional gifts of any type of property, in effect in 1903 as P.L.1887, Chapter 11 §§ 1–2, as amended by P.L. 1899, Chapter 44 §§ 1–2, and now as 30 M.R.S.A. § 1904, contemplated gifts for "educational, benevolent and charitable purposes" and "public cemeteries." We read these phrases as evidencing legislative intent to authorize the receipt of donations for purposes *supplementing* those previously expressly recognized as authorized for municipalities—that is, for purposes which, although "public" in relation to constitutional limitations, may not yet have been explicitly delegated to municipalities.[12]

11. The Court in *Piper* also adverted to R.S. 1871, Chapter 11, § 5, as amended by P.L. 1878, Chapter 20, which required municipalities to levy taxes for schools. That statute ordered such levy "exclusive of . . . any . . . donation, devise or bequest." *Piper v. Moulton*, 72 Me. 155, 166 (1881). We view the Court's citation of the quoted statutory language as an observation that modern legislation merely confirmed common law and other statutory powers earlier enunciated rather than a reliance on the statute as the *sole* source of municipal power to take in trust.

12. Where, as expressly provided in the conditional gift statute, tax monies would support maintenance of a gift, the limit in Article IV, Part 3, § 1 that such use be for public "benefit" would, of course, obtain. In the case of the "money . . . in trust" sections, however, even that constitutional stricture would not apply were the trust one requiring no outlay of public funds. See: *Libby v. City of Portland*, 105 Me. 370, 372–374, 74 A. 805 (1909).

Accordingly, as here applicable, the "money . . . in trust" and "conditional gift" statutes did not purport to restrict whatever authority had already been reposed in municipalities to receive property and to raise revenues by taxation to maintain it.

The prior decisions of this Court are consistent with this view.

We previously quoted the judicial assessment of the course of legislative delegation of authority to municipalities in the nineteenth century, that

"[b]y subsequent Acts, . . . the exercise of *doubtful* powers . . . [was] *confirmed* by legislative authority." *Opinion of the Justices,* 52 Me. 595, 598 (1863) (emphasis supplied)

The quotation reveals this Court's early awareness that many statutory provisions had sprung from excess caution by the Legislature. Insofar as the two statutes under examination referred to an area of authority already exercised by municipalities—for example, by expressly including "educational" purposes—they reflect the legislative abundance of caution to "confirm" the validity of the exercise of such powers.

Further, this Court has never referred to the "money . . . in trust" and "conditional gift" statutes now under consideration as the *sole* sources of municipal power in any of the instances in which municipal authority had already been independently granted.

The events giving rise to the opinion in *Piper v. Moulton,* supra, occurred after enactment of the "money . . . in trust" statute.[13] While the Court did refer to a statute requiring municipal support of public schools, it did not discuss the "money . . . in trust" statute and relied instead on the power of towns, *as already independ-*

*ently conferred,* to receive gifts in trust for purposes *previously legislated* as municipal and also within constitutional bounds.[14] The treatment accorded the "money . . . in trust" section in *Luques v. Dresden,* supra, decided in 1885, was similar. Noting express authority in the town of Dresden to accept legacies for the benefit of burial grounds by virtue of R.S. 1883, Chapter 15 § 14, the Court struck down without reference to the "money . . . in trust" statute a gift of mixed property requiring the town to levy taxes to support a *private* cemetery. The fault was not in the gift's form or the nature of the subject property; the infirmity was that the gift required expenditure of municipal revenues for *private* purposes. The legislative limitation of such conveyances to land and legacies for its maintenance in R.S.1883, Chapter 15 § 14 also recognized this distinction; such conveyances, unlike a conditional gift or trust of real estate alone, did not involve future outlay of public funds for impermissible purposes. We, therefore, regard *Piper* and *Luques* as primarily concerned with pre-existing municipal powers, and limits thereon, to receive and maintain property. Statutes such as the "money . . . in trust" sections and the burial ground provision cited in *Luques* were seen as *supplemental* to the established pattern of law described earlier.

We find nothing in decisions following the enactment of the "conditional gift" statute in 1887 to change this view. On the contrary, the opinions of this Court continued to deny any *exclusive* effect to either the "money . . . in trust" or the "conditional gift" statute.

In *City of Bangor v. Beal,* 85 Me. 129, 26 A. 1112 (1892), the "money . . . in trust" statute was cited in support of municipal power to accept and execute a trust of money "for the promotion of education."

---

13. The "money . . . in trust" statute, originally passed as P.L.1873, Chapter 92 §§ 1–4, preceded by four years the death of donor Piper in 1877. The opinion was rendered in 1881.

14. See n. 11, supra.

# 194

That power was not there contested and we do not read the Court's reference to the "money . . . in trust" statute, within whose express terms that particular trust fell, as intimating that the "money . . . in trust" statute overrode whatever authority had previously been delegated to the municipality to take the gift in question. Likewise, the citation of the "money . . . in trust" statute in *Inhabitants of York v. Stewart,* 110 Me. 523, 526, 87 A. 372 (1913) was only to assist the discussion of the manner in which the performance of a trust falling within the express terms of the "money . . . in trust" statute would be regulated; there was no intimation concerning either the nature of the municipality's authority as it existed before, and independently of, the enactment of the "money . . . in trust" statute, or the effect of that statute on any such already existing authority. Finally, many other decisions of this Court have upheld *sub silentio* the authority of municipalities to take gifts of *real,* as well as personal, property for public purposes whether in the manner of trusts or conditional gifts. See: e.g., *Farrington v. Putnam,* 90 Me. 405, 37 A. 652 (1897); *Manufacturers National Bank v. Woodward,* 138 Me. 70, 21 A.2d 705 (1941); *City of Bangor v. Merrill Trust Company,* 149 Me. 160, 99 A.2d 298 (1953); *City of Belfast v. Goodwill Farm,* 150 Me. 17, 103 A.2d 517 (1954).

■ We hold, therefore, that even if Miriam Winslow's conveyance may have been intended to create a charitable trust of land, the City had lawful authority to be the trustee and use tax-raised monies to fulfill the trust purposes. Such authority had been legislatively delegated before, and independently of, the enactment of the "money . . . in trust" and "conditional gift" statutes, and was not overridden by them.

*II—The Question Whether Miriam Winslow's 1903 Conveyance Established a Trust or was a Gift of a Fee Simple Determinable*

We come, then, to the question whether Miriam Winslow's 1903 gift created a charitable trust or was a conditional gift conveying to the City of Portland a fee simple determinable.

Before addressing this question head-on, we consider, to pass beyond, a preliminary question raised by the Rands.

■ Noting that the "conditional gift" statute, as in effect in 1903, required a municipal election for the acceptance of donations within its terms, the Rands argue that the procedure surrounding acceptance of Miss Winslow's deed was defective because the acceptance was effected merely by vote of the City Council.[15] Whatever the legal impact of the mode of acceptance might be, we find that we need not presently be concerned with it. Whether the City of Portland complied with procedures which, in 1903, constituted lawful consent[16] is a question between the municipality and the State, absent express provision of forfeiture for such failure.[17] *Farrington v. Putnam,* 90 Me. 405, 37 A. 652 (1897). See also: 69 A.L.R. 1359 and appropriate cases cited therein. We, therefore, reject

15. The statute was amended effective March 28, 1903 to allow acceptance by the method followed here. P.L.1903, Chapter 188 §§ 1-2.

16. Since we have held basically inapplicable to Miriam Winslow's conveyance both the "money . . . in trust" and "conditional gift" statutes, their provisions regarding the mode of acceptance are likewise of no force here.

17. Neither statute contains penalties for failure to follow certain acceptance procedures. The conditional gift sections are silent as to any forfeiture; the trust sections, while specifying reversion to the donor as a consequence of breach of trust, are silent as to the mode of acceptance. Nor does Miriam Winslow's deed require any specific vote or provide penalties in regard to such matter.

the attack by the Rands on the validity of the manner of acceptance in the instant circumstances.[18]

## II-A. The Legal Effect of the 1903 Deed

To answer whether Miriam Winslow's 1903 conveyance created a charitable trust or was a conditional gift establishing in the City of Portland a fee simple determinable, we must, as we have many times observed, seek out the intention of the particular donor as objectively manifested in all the circumstances legally admissible for consideration and uniquely relevant to the transaction under scrutiny. We conclude, here, that the objective import of Miriam Winslow's conveyance was the creation of a charitable trust.

Initially, we advert to the countless number of decisions finding trusts in the absence of express language of trust. See: e.g., *Neely v. Hoskins,* 84 Me. 386, 390, 24 A. 882 (1892); *Inhabitants of York v. Stewart,* 110 Me. 523, 87 A. 372 (1913); *Manufacturers National Bank v. Woodward,* supra; *City of Belfast v. Goodwill Farm,* supra. Of the two cases decided by this Court when it was previously called upon to distinguish determinable fee from trust,[19] one case imposed a trust based on language similar to the words before us. *Neely v. Hoskins,* supra. The other, *City of Bangor v. Merrill Trust Company,* supra, found a determinable fee. In *City of Bangor,* however, while the language was similar to that here, the circumstances were sufficiently different, as apparent from the face of the instrument, to distinguish *City of Bangor* from the case at bar. The will there in question contained a comprehensive plan disposing of the testator's property through several express trusts as well as through the provision construed as creating a determinable fee. 149 Me. at pp. 161–163, 99 A.2d 298. It was, therefore, reasonable for this Court to conclude that the wording of the construed provision, strikingly different from the trusts imposed elsewhere in the same instrument, was intended to convey some interest other than a trust. Here, we have no similar indication that had Miriam Winslow wished to create a trust, she knew how to do it by express language.

The face of Miriam Winslow's deed reveals that she had two purposes in mind when she gave her property to the City of Portland. She wished, first, to provide a park in the neighborhood where she had grown up. Thus, she directed the grantee to maintain the gift,

"the same to be improved and cared for under the direction and supervision of the Park Commissioners of the City of Portland . . .."

Should the establishment of the park not be completed within two years of June, 1903, she ordered reversion "to the grantor."[20] Second, Miriam Winslow desired to honor her parents, also residents of the Winslow Park neighborhood. To

18. We do not view our consideration of the City's authority in the same light, for its ability to receive Miriam Winslow's gift, had one method of receipt been deemed exclusive, might have aided our determination of the form in which she chose to convey.

19. We find inapposite, for example, our recent decision in *Babb v. Rand,* Me., 345 A.2d 496 (1975), which held that certain testamentary language created a fee simple on condition subsequent. There was in that case no issue of a trust; we were merely asked to characterize as fee simple absolute or determinable fee a transaction between private parties with no charitable aspect.

20. We read the express reverter concluding the first sentence of the proviso as applicable only to failure to improve the land within two years rather than as operative upon any future breach of condition. We do so, first, because of the placing of the reverter immediately after the two-year provision and before the sentence concerning the memorial plaque, and, second, because it refers only to the grantor instead of to her heirs, thus evidencing no thought of a time period beyond the immediate future.

this end, she recited as "consideration" her "love and affection" for the elder Winslows and directed that a memorial tablet be "*forever* maintained at some suitable point within said park." (emphasis supplied)

In light of her dual purpose, and her express wish that her objects continue "forever", we believe it more consonant with Miriam Winslow's true intent that her conveyance be held to create a charitable trust rather than to be a gift to the City of Portland of a fee simple determinable.

■ By a determinable fee Miriam Winslow's goals would be achieved only so long as the City would choose to comply with the terms of the deed. Upon breach of condition, there would be no mechanism whereby the benefit to the neighborhood, and the memorial to James and Ella Winslow, could be ordered continued; instead, the property would pass to Miss Winslow's heirs, however remote and unknown to her they might be. Through the establishment of a charitable trust, however, the City would be placed under affirmative fiduciary obligation to carry out Miriam Winslow's purposes in perpetuity. Upon breach, the City could be ordered to comply; if for some reason it could not continue as trustee the appropriate Court could replace it with another. Finally, were some supervening event to frustrate the original scheme, as here, the doctrine of "*cy pres*" might be available to save Miss Winslow's plan.

### III. The Availability of a Cy Pres Approach

The issue remaining to be addressed, then, is whether the charitable trust created by Miriam Winslow having failed, there may be a *cy pres* administration of the trust on the basis that the settlor had manifested a general charitable intent. *Snow v. President and Trustees of Bowdoin College,* 133 Me. 195, 175 A. 258 (1934); *Bancroft v. Maine State Sanatorium Association,* 119 Me. 56, 109 A. 585 (1920).

■ Ascertainment of the presence, or absence, of "general charitable intent" requires an ad hoc scrutiny of the settlor's intent in specific relation to the fact that the particular gift made has failed. *Snow v. President and Trustees of Bowdoin College,* supra; *Robert W. Traip Academy v. Staples,* Me., 317 A.2d 816 (1974); 4 Scott on Trusts (3rd Ed.) § 399. More precisely, then, our inquiry must focus upon determining whether Miriam Winslow viewed the exact original location of Winslow Park as essential to her scheme, preferring its extinction at any future date to continuance at another site.

We decide that she did not.

■ The authorities furnish us with some general guidance. Thus, the absence of an express reverter has often been held indicative of "general charitable intent." *Pierce v. How,* 153 Me. 180, 200, 136 A.2d 510 (1957); *Louisa T. York Orphan Asylum v. Erwin,* Me., 281 A.2d 453, 457 (1971); *Petition of Rochester Trust Company,* 94 N.H. 207, 208, 49 A.2d 922 (1946). An order permitting administration *cy pres* is more appropriate once the trust has been performed than at the outset. *Pierce v. How,* supra, 153 Me. at 194, 136 A.2d 510; 4 Scott on Trusts, supra, § 399.3 at 3111. Conversely, where the dispositive instrument clearly shows an attachment to one object, or one donee, the subject property will revert to the donor's estate. *Snow v. President and Trustees of Bowdoin College,* supra, 133 Me. at 200, 175 A. 268, citing, *inter alia, Gilman v. Burnett,* 116 Me. 382, 102 A. 108 (1917) and *Bancroft v. Maine State Sanatorium Association,* supra. Likewise, an order permitting administration *cy pres* of a trust established to further a purpose already accomplished is normally inappropriate. *Doyle v. Whalen,* 87 Me. 414, 32 A. 1022 (1895); 4 Scott on Trusts, supra, § 399.3 at 3112–3113.

■ In light of these guidelines, we find the wording of Miriam Winslow's

1903 deed, as read in view of surrounding factors, to be more indicative of a general charitable intent by Miss Winslow than a purpose by her that her gift be operative only as restricted to its precise terms.

We previously noted the absence of any express reverter other than the provision directing forfeiture for failure to complete construction within two years. See n. 20, supra. Indeed, the inclusion in the document of an express reverter limited to the initial two-year period enhances the significance of the absence of a like provision applicable after that period. Had she wished, Miriam Winslow evidently knew how to direct reversion to her heirs. We, therefore, conclude that her desire was otherwise.

Also persuasive is the fact that the trust has failed of specific performance after successful operation for half a century.

The inclination of Courts to favor *cy pres* administration once a charitable trust has been in effect has, basically, two theoretical underpinnings.

One is a dictate of practicality:—the ascertainment and location of remote heirs after the passage of time entails difficulty and expense tending to discourage the finding of an intended reversion. 4 Scott on Trusts, supra, § 399.3 at 3111. The instant case presents no such problems, since the heirs have apparently come forward without delay. To the extent that the potential for practical difficulties enters into assessment of the donor's intent, however, the theory is consistent with our view of Miriam Winslow's wishes.

A second rationale for the favoring of *cy pres* administration of an operating charitable trust is that *cy pres* will more likely fulfill the donor's intent:

" 'The court can fairly infer an expectation on the part of the settlor that in course of time circumstances might so change that the particular purpose could no longer be carried out, and that in such a case the settlor would prefer a modification of his scheme rather than that the charitable trusts should fail and the property be distributed among his heirs who might be very numerous and only remotely related to him.' " *Pierce v. How,* 153 Me. 180, 194–195, 136 A.2d 510, 518 (1957), citing Restatement of the Law, *Trusts,* § 399.f.

We find appropriate, here, an inference that the donor would have preferred modification of her original plan, carried on successfully for 50 years, to a distribution of condemnation proceeds to remote [21] heirs.

Further, we are satisfied, as we explain more fully below, that Miriam Winslow did not manifest an attachment to the original site sufficiently strong to bar removal, through the medium of *cy pres,* to another site nearby. We stress, too, that this is not a case where the donor's purpose has been fully accomplished; instead, the park was to be maintained in perpetuity.

We find no Maine case presenting the *special* duality of purpose evidenced by Miriam Winslow's deed, that is, a charitable goal (establishment of a public park) coupled with a personal desire to memorialize deceased loved ones.

Thus, our decision in *Gilman v. Burnett,* 116 Me. 382, 102 A. 108 (1917), rejecting the use of *cy pres* based on the donor's

21. Nowhere in the record have the Rands provided evidence of their relation to, or acquaintance with, Miriam Winslow. Instead, they are styled merely as "heirs." Since Miss Winslow's parents were dead when she executed the deed in 1903, we may infer that she was by then of advanced age. We do not know when she died, or whether she eventually married. Fifty years have passed since that time, so that it is quite possible the heirs before us never knew the founder of "Winslow Park." We can only conclude on the basis of these inferences, and unguided by evidence in the hands of appellees, that there was no strong attachment to them on Miss Winslow's part.

special attachment to the beauty of a site no longer available, is not fully apposite since it lacks the memorial element. Insofar as *Gilman* provides an example of the importance of a location alone, we find it distinguishable from the instant situation. The testatrix there wished to establish a refuge for employees of the "straw industry of Massachusetts" on her Augusta, Maine farm. Thus, the particular quality of that rural setting was held essential to her scheme, she having expressly described it as "this beautiful spot" in her will. Miriam Winslow's deed contains no such reference, and we infer that she was attached only to the neighborhood and to her parents' memory, not to any unique characteristic of the triangular plot conveyed.

In *Perry v. Town of Friendship*, Me., 237 A.2d 405 (1968) this Court found an absence of general charitable intent in relation to a gift for the erection of a community building in which was to be placed a plaque in memory of the testatrix' late husband. 237 A.2d at 406. We note that such finding was not really necessary to the decision since it was not shown that the trust had failed, 237 A.2d at 409; see also: *Miller v. Inhabitants of Town of Friendship*, Me., 265 A.2d 608 (1970). In any event, on its actual facts *Perry* is plainly distinguishable from the situation before us. The testatrix had directed that her gift was

> "to be *added* to the Community Building Fund and to be used for the erection and maintenance of a Community Building . . . ." (p. 406 of 237 A.2d) (emphasis supplied)

Thus, the Court was not there asked merely to change the *location* of a charitable project after half a century of successful service while preserving its initial park/memorial character. Rather, it was proposed that the gift be diverted from a fund and a *purpose* apparently in existence and known to the donor before her death, and that this be done before any operation according to her direction. The special goal sought by the testatrix in *Perry*, as enhanced by her knowledge before death that the town itself contemplated implementing that goal and thus would surely carry out her specific gift, sharply distinguishes *Perry* from the case at bar.

Decisions of other courts, concerned with situations more akin to the instant case, lend support for a finding, here, of the general charitable intent making *cy pres* administration appropriate.

In *State v. Federal Square Corporation*, 89 N.H. 538, 3 A.2d 109 (1938), a trust supporting a library in the City of Concord, New Hampshire failed of its specific purpose because of the State's exercise of eminent domain. The building in which it was housed had been conveyed fifty years earlier by deed specifying that it be used in perpetuity as a public library, and directing the maintenance of an inscription honoring the donors' parents,

> "for fifty years residents of Concord, and always active promoters of the educational and intellectual advancement of its citizens." (p. 540 of 89 N.H., p. 111 of 3 A.2d).

The Court ordered that *cy pres* be utilized to continue the library elsewhere. The Court reasoned that no express provision barred such application, and

> "[n]o reasons practical or sentimental exist to demand that the site conveyed by the deed should be the only one which under all circumstances must be kept in order to keep alive the trust." (p. 544 of 98 N.H., p. 114 of 3 A.2d)

The case at bar is strikingly similar. "Winslow Park" provided public benefit and private memorial until condemnation terminated it; it too had operated for several years; its governing instrument contains no stated prohibition against removal to another site in the event of taking by eminent domain. While it may be argued that "sentimental" considerations here endow the subject land with special value—

since it had once been owned by Miriam Winslow's father—we do not so find. It was but a plot of land without buildings, chosen to benefit the public and memorialize the Winslows in their beloved neighborhood, as the donors in *State v. Federal Square Corporation,* supra, chose to honor their forebears' interest in the City of Concord and the "advancement of its citizens." See also: *Rector of St. James Church v. Wilson,* 82 N.J.Eq. 546, 89 A. 519 (1913), aff'd sub nom. *West v. Rector of St. James' Episcopal Church of Long Branch,* 83 N.J.Eq. 324, 91 A. 101 (1914).

Other courts have approved a change in location under *cy pres* administration where faced with a sentimental attachment to an original site stronger than any we can discern here. Thus, in *Rogers v. Attorney General,* 347 Mass. 126, 196 N.E.2d 855 (1964), the Massachusetts Court ordered abandonment as the location of a home for the aged of a homestead built by an ancestor 210 years prior to the donor's death and held by her family up to that time. The Court found a general charitable intent on her part permitting such modification despite its express recognition that the donor

"had a strong attachment to the family homestead and . . . desired its preservation . . .." (p. 132 of 347 Mass., p. 860 of 196 N.E.2d.)

See also: *In re Wornock's Will,* Sup., 124 N.Y.S.2d 8 (1953). The facts of *In re Wilkey's Estate,* 337 Pa. 129, 10 A.2d 425 (1940) are closer to those now before us. The testatrix there established a trust for the purpose of razing a farmhouse in the City of Philadelphia held by her family since the days of William Penn, and erecting on that site a church memorializing the Wilkey family, using, if possible, stones from the razed house. Shortly after her death the land was condemned for school purposes. The Pennsylvania Court held the importance of the site secondary to her dual charitable—commemorative purpose, and ordered construction of the memorial church elsewhere.

We presently confront no question of the special feelings evoked by long-established family homesteads; instead, we deal only with a vacant parcel of land. See, e. g., *Shoemaker v. American Security & Trust Company,* 82 U.S.App.D.C. 270, 163 F.2d 585 (1947).

■ Finally, at least one court has recognized the special force of a commemorative purpose in determining the existence of general charitable intent. Any such goal, coupled, of course, with a desire to benefit the public, tends to strengthen the inference that the donor wished modification in order to ensure perpetual operation, since failure of the charity entails failure of the memorial as well. *In re Young Women's Christian Association of New York,* 96 N.J.Eq. 568, 126 A. 610, 613 (1924).

We, therefore, interpret the 1903 deed of Miriam Winslow as evidencing a general charitable intent sufficient to permit, by use of *cy pres,* the removal of the public park, and its plaque honoring James N. and Ella M. Winslow, to the proposed site at Baxter Boulevard and Preble Street Extension in the City of Portland.

The entry is:

*Appeal sustained.*

*Case remanded to the Superior Court for further proceedings consistent with the opinion herein.*

All Justices concurring.